UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

LAURA BELIN,

      *Plaintiff*,

v.

MEGHAN NELSON, in her official
capacity as Chief Clerk of the Iowa House
of Representatives,

      *Defendant.*

Case No. _____

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

TABLE OF CONTENTS

Table of Authorities ...................................................................................... iii

Introduction ................................................................................................... 1

Statement of Facts ........................................................................................ 2

Argument ...................................................................................................... 10

    I.     Belin is Likely to Succeed on the Merits ............................................. 11

        A.  Belin has a First Amendment right to news gather ................. 11

        B.  Nelson's denial of Belin's access to the House press box is content- and viewpoint-based discrimination ........................... 13

        C.  Nelson's policy is vague ........................................................... 16

    II.    Belin has Suffered and Will Suffer Irreparable Harm if Nelson is Permitted to Enforce the Unconstitutional Credentialing Policy Against Her ......................................................................................... 17

    III.   The Public Interest and Balance of Equities Favor Belin .................. 19

    IV.   This Court should Forego the Bond Requirement ............................... 20

Conclusion .................................................................................................... 20

TABLE OF AUTHORITIES

<u>Cases</u>

*Am. Broad. Cos. v. Cuomo,*
    570 F.2d 1080 (2d Cir. 1977)................................................................ 12

*Anderson v. Cryovac, Inc.,*
    805 F.2d 1 (1st Cir. 1986).................................................................... 13

*Baldor Elec. Co. v. Kelderman,*
    No. 4:12cv0409-JAJ, 2012 U.S. Dist. LEXIS 203609 (S.D. Iowa Sep. 7, 2012) ..... 10

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ............................................................................. 11

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ............................................................................. 15

*Consumers Union v. Periodical Correspondents' Assoc.,*
    365 F. Supp. 18 (D.D.C. 1973) ............................................................. 12

*Consumers Union v. Periodical Correspondents' Assoc.,*
    515 F.2d 1341 (D.C. Cir. 1975) ............................................................ 12

*Dataphase Sys., Inc. v. CL Sys., Inc.,*
    640 F.2d 109 (8th Cir.1981) ............................................................ 10, 11

*Doctor John's, Inc. v. City of Sioux City,*
    305 F. Supp. 2d 1022 (N.D. Iowa 2004).............................................. 20

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................. 18

*Getty Images News Servs. Corp. v. Dep't of Def.,*
    193 F. Supp. 2d 112 (D.D.C. 2002) ..................................................... 15

*Hill v. Xyquad, Inc.,*
    939 F.2d 627 (8th Cir. 1991) ............................................................... 20

*Iowa Prot. & Advocacy Servs. v. Gerard Treatment Programs, L.L.C.,*
    152 F. Supp. 2d 1150 (N.D. Iowa 2001)............................................... 20

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ............................................................................. 14

*Marcus v. Iowa Pub. Television,*
    97 F.3d 1137 (8th Cir. 1996) ............................................................... 18

*Minnesota Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) ........................................................................ 14

*Ness v. City of Bloomington*,
  11 F.4th 914 (8th Cir. 2021)..................................................................................... 11

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................................... 11, 19

*Phelps-Roper v. Nixon*,
  545 F.3d 685 (8th Cir. 2008) ................................................................................ 19

*Phelps-Roper v. City of Manchester, Mo.*,
  697 F.3d 678 (8th Cir. 2012) ................................................................................ 19

*Quad-City Cmty News Serv. v. Jebens*,
  334 F. Supp. 8 (S.D. Iowa 1971) ..................................................................... 11, 15

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019) ................................................................................ 14

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) ....................................................................................... 13, 14

*Reno v. ACLU*,
  521 U.S. 844, 872 (1997) ...................................................................................... 17

*Roach v. Stouffer*,
  560 F.3d 860 (8th Cir. 2009) ................................................................................ 15

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977) .............................................................................. 19

*Stahl v. City of St. Louis*,
  687 F.3d 1038 (8th Cir. 2012) .............................................................................. 17

*Tex. v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................. 13

*TGP Communs., Ltd. Liab. Co. v. Sellers*,
  No. 22-16826, 2022 U.S. App. LEXIS 33641 (9th Cir. Dec. 5, 2022).......... 13, 14, 18

*United States v. Stupka*,
  418 F. Supp. 3d 402 (N.D. Iowa 2019)................................................................... 17

*United States v. Williams*,
  553 U.S. 285 (2008) ............................................................................................. 16

*Westinghouse Broad. Co. Inc. v. Dukakis*,
  409 F. Supp. 895 (D. Mass. 1976) ......................................................................... 13

Other Authorities

*About*,
  IALNS (https://perma.cc/9JFH-JZ7N)....................................................................... 7

Cullen, Art, *Shooing out the public, Storm Lake Times Pilot*, Jan. 30, 2019,
    available at: https://perma.cc/ZE76-762D .................................................................. 3

Eighty-Seventh General Assembly House Rules,
    available at: https://perma.cc/3739-JBBP ........................................................... 5

Glueck, Katie, The early-state must follows, Politico, Jan. 5, 2015, available at:
    https://perma.cc/6VJT-ZXH6 .................................................................................... 4

Hunter, Carol, Roses & thistles: Iowa GOP lawmakers apparently afraid of liberal
    blogger's coverage, Des Moines Register, Feb. 1, 2019, available at:
    https://perma.cc/N4G5-99A2 .................................................................................... 4

Jennings, Natalie, *The Fix's 2020 list of outstanding politics reporters to follow in
    every state*, The Washington Post, Oct. 26, 2020, available at:
    https://perma.cc/H5ZU-7WU8 .................................................................................. 3

Our opinion: press pass denial takes on air of politics, Telegraph-Herald, Feb. 1,
    2019, available at: https://perma.cc/LGT8-WU43 ..................................................... 4

*Rules and Regulations*, Periodical Press Gallery, available at:
    https://perma.cc/89TA-PJ7Q ..................................................................................... 5

INTRODUCTION

This case presents a time-sensitive emergency. The 2024 Iowa Legislative session began on January 8, 2024 and is expected to end in April 2024. Plaintiff Laura Belin, despite over 30 years of news reporting experience and hundreds of articles to her name, has been denied the ability to attend the Iowa House sessions as a member of the press simply because the majority disapproves of her point of view. Accordingly, Belin seeks a TRO and preliminary and permanent injunctions granting her full press credentials and equal access and use of video, still photography, and audio recording equipment as is afforded to every other member of the media.

Belin, is no fly-by-night operator. Her 30-year career has earned her much acclaim. Des Moines Cityview's "Civic Skinny" called Belin "probably the hardest-working — and perhaps the best — political reporter in the state" and "one of the best investigative reporters in the state." The Fix at the Washington Post named Belin as one of Iowa's outstanding political reporters in 2020 and previously named Bleeding Heartland among the "best state-based political blogs." Politico put Belin on its list of "early state must-follows." Charles Pierce of Esquire has called Bleeding Heartland, Belin's news site, an "essential Iowa political blog." Additionally, she is statehouse correspondent for KHOI Community Radio in Ames (89.1 FM), where she regularly appears on the program Capitol Week.

Yet it is because of the very same reporting that has earned her much acclaim that Belin has been barred from covering the State House on equal terms with every other member of the press. These petty dictates serve both to deny equal access to Belin, and to dissuade other reporters from being too negative in their coverage, lest they too, suffer the same fate.

Open government has been a hallmark of our democracy since our nation's founding. But Meghan Nelson, Chief Clerk of the Iowa House, pays no mind to that. Instead, using an arbitrary and vague, and ever shifting set of criteria, Nelson engages in content- and viewpoint-based discrimination against Belin to deny her the ability to news gather and effectively report on the Iowa Legislatures' actions. Nelson should not be permitted to continue to violate Belin's free speech and free press rights during the Iowa's 90th Legislative Session. This Court's immediate intervention is the only way to ensure that does not happen in this legislative session. There is absolutely no harm to others in granting this injunction. And we all benefit from a fully enforced First Amendment.

STATEMENT OF FACTS

*Laura Belin's background*

Plaintiff Laura Belin is the publisher, editor, and primary reporter for Bleeding Heartland, a news website focused on Iowa politics. Declaration of Laura Belin ¶1. She is also the Statehouse reporter for KHOI Radio in Ames and co-host of the station's "Capitol Week" program, as well as a member of the Iowa Writers' Collaborative. *Id*. ¶2. Belin has been a news reporter for almost 30 years. *Id*. ¶5.

2

Bleeding Heartland was established in 2007 and provides reporting on Iowa politics. *Id*. ¶3. Belin has been its lead author and sole editor since 2008. *Id*.

In 2023, Bleeding Heartland published 498 news articles and commentaries from more than 125 authors. *Id*. ¶6. During the previous 2023 legislative session, Bleeding Heartland got between 88,000 and 119,000 monthly views. *Id*. Belin's readership includes lawmakers, staffers, and prominent members of the media, making her one of the most-read political reporters in Iowa. *Id*.

Belin is frequently asked to write opinion articles for other well-known news organizations. *Id*. ¶7. Her byline has appeared in the online news sites for the Iowa Capital Dispatch, CNN, Raw Story and several local newspapers. *Id*. She also periodically appears on C-SPAN's Washington Journal to discuss Iowa politics. *Id*.

Belin has a strong reputation among Iowa journalists. *Id*. ¶8. Indeed, one Pulitzer Prize winning columnist has called her an "astute observer of politics left and right" who "offers straight-forward statistical analysis on legislative races, takes deep dives into state fiscal affairs with guest analysts, and the like."[1] The Fix at the Washington Post named Belin as one of Iowa's outstanding political reporters in 2020 and previously named Bleeding Heartland among the "best state-based political blogs."[2] Politico put Belin on its list of "the must-follow journalists on the

---

[1] Cullen, Art, *Shooing out the public*, Storm Lake Times Pilot, Jan. 30, 2019, available at: https://perma.cc/ZE76-762D.
[2] Jennings, Natalie, *The Fix's 2020 list of outstanding politics reporters to follow in every state*, The Washington Post, Oct. 26, 2020, available at: https://perma.cc/H5ZU-7WU8

ground in Iowa."[3] The Dubuque Telegraph-Herald editors have stated Belin is "one of Iowa's top political journalists;"[4] while the Des Moines Register described her as a "top-notch journalist who regularly breaks news."[5]

*Press Access in the Iowa House*

The primary way that journalists gather news on the Iowa legislature is by attending legislative sessions and press briefings. Belin Decl. ¶10. The Chief Clerk of the Iowa House of Representatives offers a credentialing system that grants journalists press access to the press box on the House floor. *Id*. House press credentials give journalists significant access and advantages. *Id*. ¶11. Access to the press box gives journalists guaranteed seats and desks with nearby electrical outlets so they can more easily use laptops and take notes, take photographs and video, and request interviews from, and interact with, legislators on the floor. *Id*. House press credentials allow reporters to receive press releases, transcripts, and staff analyses of bills that are routinely distributed in the press boxes. *Id*.

Credentialed reporters are also given the ability to participate in impromptu press briefings, including by Speaker Grassley, that are held by House representatives at the front of the press boxes during certain legislative days. *Id*. ¶12.

---

[3] Glueck, Katie, *The early-state must follows*, Politico, Jan. 5, 2015, available at: https://perma.cc/6VJT-ZXH6
[4] *Our opinion: press pass denial takes on air of politics*, Telegraph-Herald, Feb. 1, 2019, available at: https://perma.cc/LGT8-WU43
[5] Hunter, Carol, *Roses & thistles: Iowa GOP lawmakers apparently afraid of liberal blogger's coverage*, Des Moines Register, Feb. 1, 2019, available at: https://perma.cc/N4G5-99A2

*2019 Iowa Legislative Session*

In 2019, Belin emailed Carmine Boal, then-House Chief Clerk, requesting access in her role as a reporter for Bleeding Heartland. **Exhibit A** at 6. Belin had been already reporting on Iowa legislators and their legislative actions for 12 years. Belin Decl. ¶14. At the time, Boal did not have any written policy regarding how press credentials were approved and what criteria determined which members of the press were permitted in the House floor press area. *Id*. ¶15.

Boal denied Belin's request by telling her that "press credentials are not issued to members of the public." Exh. A at 5. Belin asked Boal for clarification and explained that she "ha[d] been covering Iowa legislative happenings for Bleeding Heartland for nearly 12 years" and had also had her reporting "cited in many Iowa and national media outlets." *Id*. at 4-5. Boal's reply did not address Belin's points, but only pointed to Iowa House Rules 4 and 20 as well as the U.S. Congress' policy governing press galleries.[6] *Id*. at 4.

On January 8, 2019, Belin asked Boal to explain what "specific language" in the House and Congressional Rules "exclud[ed] [her] as a member of the press." *Id*. at 3. Belin also asked whether "the objection was grounded in Iowa House leaders disliking the content of [her] reporting." *Id*. Boal did not reply.

---

[6] Neither of these House Rules discuss what criteria a journalist must meet for press access to the House floor press box. *See* Eighty-Seventh General Assembly House Rules, available at: https://perma.cc/3739-JBBP. And the Congressional Rules provide only that press galleries are reserved for "bona fide resident correspondents of reputable standing, giving their chief attention to the gathering and reporting of news." *Rules and Regulations*, Periodical Press Gallery, available at: https://perma.cc/89TA-PJ7Q.

In a follow-up email on January 27, 2019, Belin asked Boal to explain why she had been denied when, "in the past years, the Iowa House ha[d] credentialed others reporting for online publications." *Id*. at 1. She asked Boal to send her the list of applicants who, like her, had been denied credentials to cover the Iowa House and a list of those from previous sessions who had also been denied. *Id*. Although Boal refused to confirm or deny, Belin believes no one else was denied press credentials. Belin Decl. ¶21.

Boal never responded or sent any lists. Instead, the next month, the Iowa House issued its first-ever written policy on credentialing. **Exhibit B.** In its policy, the Iowa House declared that the Chief Clerk administered press credentials for onsite media access to the House and would only credential "bona fide correspondents of repute in their profession." *Id*. at 1. Thus, an applicant would have to "establish to the satisfaction of the Chief Clerk of the House that he or she is a paid correspondent who requires on-site access to House representatives and staff." *Id*.

Additionally, the 2019 Policy stated that "[c]orrespondents must be employed by a news organization . . . [w]ith the General Publication periodicals mailing privileges under U.S. Postal Service rules, and that publishes regularly; or [w]hose principal business is the regular dissemination of original news to a broad segment of the public." *Id*.

Following issuance of the 2019 Policy, thirty-seven editors, news directors, and publishers signed a letter authored by the Iowa Freedom of Information

Council to the governor and legislative leaders regarding the denial of Belin's application. **Exhibit C**. They urged the House to "immediately revise [its] policies and practices on media credentials and to begin granting them in ways that are above question and that ensure fairness and equality of access." *Id*. at 2. The plea from other members of the media was ignored.

*2020 Iowa Legislative Session*

Belin applied for press credentials with the Iowa House again in January 2020. **Exhibit D.** This time, Belin included a letter with her application, explaining her qualifications under the policy. *Id*.

On January 10, 2020, Nelson responded to Belin's application submission via email stating that Belin "d[id] not meet the requirements of the Iowa House of Representative's press credentialing policy." **Exhibit E** at 2. The only reason Nelson provided Belin for the denial was that "[t]he House does not credential outlets that are nontraditional/independent in nature." *Id*. Belin responded the same day, asking Nelson for a "specific reason" why she did not meet the requirements and noted she was similarly situated to Jack Hunt, who had been "credentialed in the Iowa House for decades." *Id*. at 1.

Jack Hunt reports for, as well as owns and operates, the Iowa Legislative News Service. *See About*, IALNS (https://www.ialns.com/about). Although Jack Hunt appeared on a January 21, 2020 list of Iowa House credentialed reporters, his name was omitted from a revised list issued January 24, 2020. Belin Decl. ¶29. Following this, Nelson told Hunt that the House would credential him through an

7

Omaha-based radio station. *Id.* Although Hunt was neither employed nor paid by that station, he reappeared on a February 7, 2020 list of House-credentialed reporters as representing KIBM /KOBM. *Id.*

Observing this, Belin signed an employment agreement with KHOI Radio to serve as its statehouse correspondent in December 2020. *Id.* ¶30. KHOI's station manager emailed Meghan Nelson to request credentials for Belin. **Exhibit F** at 2-3. Nelson vaguely replied that the House had not yet decided what the process would be for the next session. *Id.* at 2. This was an obvious effort to move the goal posts yet again.

*2021 Legislative Session*

Press credentials for the 2021 legislative session was largely disrupted by the Covid 19 pandemic. *Id.* ¶33; *see also* **Exhibit G**. Neither Belin nor any other statehouse reporters received credentials for that year. *See id.* Speaker Grassley held press briefings via Zoom during the legislative session, but Belin was not given the link or access code to attend despite multiple requests. Belin Decl. ¶35.

*2022 Legislative Session*

For 2022, Nelson published a new "Work Space Application Policy." **Exhibit H**. This policy modified the 2019 Policy. Each House-credentialed journalist was required to be a "full-time paid employee of a news organization" whose principal business was required to be "the regular dissemination of original, nonpartisan news to a broad segment of the public." *Id.* The new policy also required that applicants abide by the Society of Professional Journalists' Code of Ethics. *Id.*

8

Belin was paid a full-time salary for her reporting for 2022. Belin Decl. ¶38. She also took steps to ensure Bleeding Heartland stories complied with the SPJ Code of Ethics and added a line on her "about" page stating that Bleeding Heartland conforms to the SPJ Code of Ethics. *Id*. ¶39.

Belin submitted her credential application in late December 2021. *Id*. ¶40. Nelson denied that application, claiming that Belin "d[id] not meet the requirements of the Iowa House of Representative's press work space policy." **Exhibit I** at 4. Nelson did not specify how Belin's application fell short.

*2023 Legislative Session*

Belin submitted her credential application for an Iowa House workspace in late December 2022. **Exhibit J**. Nelson again rejected Belin's application without explanation. *Id*. at 4.

*2024 Legislative Session*

Belin submitted her credential application for an Iowa House workspace on December 5, 2023. Belin Decl. ¶46. As part of her application, Belin was asked to explain why she needed access to the House floor, which she did. *Id*.

Belin sent follow up emails to Nelson on December 21, 2023, and January 4, 2024, looking for a decision on her application. *Id*. at ¶47. Nelson responded on January 5, 2024. **Exhibit K**. Once again, Belin's application had been denied because she "do[es] not meet the requirements of the Iowa House of Representative's press work space policy." *Id*. Once again, Nelson failed to indicate how Belin fell short.

9

The 2024 Legislative Session began on January 8, 2024 and is ongoing until at least April 16, 2024. Belin Decl. ¶¶50, 52. The House press box was opened for access on the same day session began. *Id*. ¶50. On that day, other statehouse reporters, but not Belin, were able to cover the gaveling in and opening remarks by the House leaders from both parties from the press box. *Id*. Those reporters were also present in the press box the next day, on January 9, 2024, when the Governor delivered her Condition of the State speech in the Iowa House chamber. *Id*. ¶51. Belin had no access to that press box and, without Court intervention, will not have access for the remainder of the 20204 legislative session. *Id*. ¶¶50-52. She will not be able to obtain videos, photographs and audio recordings from an advantageous position as part of her reporting materials. *Id*. She will not be able to speak to legislators and their staff, witness legislative action up close, receive legislative materials or attend impromptu press briefings. *Id*. In sum, and because of Nelson's policy, Belin will not be able to news gather. *Id*.

ARGUMENT

"The Eighth Circuit Court of Appeals has instructed this Court to utilize the same standard for both preliminary injunctions and temporary restraining orders[,]" which is "set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)." *Baldor Elec. Co. v. Kelderman*, No. 4:12cv0409-JAJ, 2012 U.S. Dist. LEXIS 203609, at *4 (S.D. Iowa Sep. 7, 2012).

When deciding to grant a TRO or a preliminary injunction, a Court must consider: (1) the likelihood of the movant's success on the merits; (2) the threat of

10

irreparable harm to the movant; (3) balance this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest. *Dataphase Systems, Inc.*, 640 F.2d at 113. The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

I.   BELIN IS LIKELY TO SUCCEED ON THE MERITS

   A.  Belin has a First Amendment right to news gather.

   The First Amendment provides Belin with a right to news gather. *Branzburg v. Hayes*, 408 U.S. 665, 728 (1972). News gathering is "entitled to First Amendment protection because [it is] an important stage of the speech process that ends with the dissemination of information about a public controversy." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (citation omitted). Without "protection for seeking out the news, freedom of the press could be eviscerated.'" *Branzburg*, 408 U.S. at 681.

   The government may not exclude a publication because of its viewpoint or because its readership consists mainly of people who vote differently than they do. *See Quad-City Cmty News Serv. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) (stating "any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional"). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media, or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d

11

Cir. 1977). Thus, any effort by the government to dictate what is a news organization must fail.

To the extent the critique is even valid, Nelson is not permitted to deny Belin press credentials on the basis that she reports for a "nontraditional" or "independent" news site. *See* Exh. E. Reporters do not have any less right to news gather because they report on behalf of a publication that the government does not respect or consider "media." In *Consumers Union v. Periodical Correspondents' Assoc.*, the court held it was unconstitutional for the government to discriminate against Consumer Reports because it was "owned and operated" by a "self-proclaimed advocate of consumer interests." 365 F. Supp. 18, 22-23 (D.D.C. 1973), rev'd on other grounds, 515 F.2d 1341 (D.C. Cir. 1975). It also explained that "[a] free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint." *Id*. at 25.

The availability of alternative methods for a resourceful reporter is of no consequence. *Consumers Union*, 365 F. Supp. at 25-26 (citations omitted) ("the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied …, constitutes a direct limitation upon the content of news."). Second-class treatment doesn't work. Reporters should "not only be given equal access, but within reasonable limits, access with equal convenience to official news sources." *Westinghouse Broad. Co.*

*Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976). The government simply cannot pick and choose which reporters are in favor based on how favorable the coverage is.

Segregating media seating or press briefings into "preferred" and "unpreferred" viewing sections is not equal access, it is unconstitutional. *See TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, at *15 (9th Cir. Dec. 5, 2022). The reason is obvious: "granting favorable treatment to certain members of the media. . . allows the government to influence the type of substantive media coverage that public events will receive." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986). Petty dictates of easily offended legislators must give way to the First Amendment.

> B. Nelson's denial of Belin's access to the House press box is content-
> and viewpoint-based discrimination.

Belin will succeed on her First Amendment claims because Nelson has engaged in content and viewpoint discrimination to deny her press credentials.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Tex. v. Johnson*, 491 U.S. 397, 414 (1989). The Free Speech Clause thus prohibits suppressing speech 'because of its message.'" *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995). Content-based restrictions are subject to strict scrutiny, which "requires a state to show that its law is narrowly tailored to serve a compelling interest." *Rodgers v.*

13

*Bryant*, 942 F.3d 451, 456 (8th Cir. 2019).

"And the First Amendment provides even stronger protection against viewpoint discrimination, which is an egregious form of content discrimination and occurs when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction on speech." *TGP Communs., Ltd. Liab. Co.*, 2022 U.S. App. LEXIS 33641 at *10 (internal quotation marks omitted); *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). The government cannot "den[y] access to a speaker solely to suppress the point of view [s]he espouses." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (quotation and citation omitted).

It is not only in traditional public forums where restrictions based on content must satisfy strict scrutiny and those based on viewpoint are prohibited. *Mansky*, 138 S. Ct. at 1885. Even in limited public forums where the government opens a traditionally private place for speech on limited topics, such as opening a portion of the House floor for press news gathering capabilities and press briefings, the First Amendment's protections against content-based and viewpoint-based restrictions remain robust. *See Rosenberger*, 515 U.S. at 829 "Once it has opened a limited forum, . . . the State must respect the lawful boundaries it has itself set" and "may [not] discriminate against speech on the basis of its viewpoint." *Id.*

The indication that government officials' inconsistent application of a policy is discriminatory is reinforced where the policy leaves the determination of "who may speak and who may not . . . to the unbridled discretion of a government

official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988). The government "must not only have some criteria to guide its determinations[ ]" as to who receives limited available press access, but it also "must have a reasonable way of assessing whether the criteria are met." *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 121 (D.D.C. 2002). When the policy has no discernible "standards governing the exercise of discretion," government officials have free reign to credential reporters "based upon the content of the speech or viewpoint of the speaker." *Roach v. Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009) (quoting *Lakewood*, 486 U.S. at 763–64)).

Additionally, the government's focus on the nature of the publication is an additional indicator of a discriminatory motive. *Quad-City Community News Service, Inc.*, for example, held a police department never "defin[ed] what constitutes or qualifies one to be a member of the 'established' press." 334 F. Supp. at 12. And the policy had not been applied uniformly to other reporters; instead, the Department was "funneling information to the public through only certain representatives who are considered more responsible because they 'cooperate' in presenting what the Department believes to be appropriate." *Id*. at 14. This was unconstitutional.

Here, the facts surrounding Nelson's application of their press credential policy against Belin points to clear viewpoint discrimination and, at minimum, content discrimination. Prior to Belin's first request for credentials in 2019, the Iowa Chief Clerk at the time, Carmine Boal, did not even have a written policy.

15

Belin Decl. ¶15. It was only a month after she denied Belin's request – and Belin repeatedly asked for the specific policy that justified the denial – that a written policy suddenly appeared. *Id.* ¶22; *see also* Exh. B. Nelson then used that 2019 policy and the subsequent new policy in 2021 to justify her refusal to provide Belin with the same press credentials that other statehouse reporters received. Exhs. E, I, J.

In doing so, Nelson either ignored Belin's requests for an explanation as to how she failed to meet the policy or told Belin she was being denied as a "nontraditional" and "independent" reporter despite the policy having no such standards. *Id.* Nelson has not treated any other reporters, besides Belin, in this way when they apply for press credentials. *Id.* ¶54. Thus, Nelson's erratic, inconsistent application of her policy to Belin, as well as Nelson's obvious focus on the nature of Bleeding Heartland as a publication, demonstrates that she denies Belin the ability to news gather for content- and viewpoint-based reasons. Thus, the policy is unconstitutional and a TRO/preliminary injunction should issue.

 C. Nelson's policy is vague.

A policy is impermissibly vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "A law's failure to provide fair notice of what constitutes a violation is a special concern where laws abut upon sensitive areas of basic First Amendment freedoms[.]'" *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041

16

(8th Cir. 2012) (quotation omitted). And "[t]he Supreme Court is particularly sensitive to laws that are vague due to the lack of guiding standards or the potential for arbitrary enforcement." *United States v. Stupka*, 418 F. Supp. 3d 402, 409 (N.D. Iowa 2019). Lack of notice and arbitrary enforcement are concerns because of the "obvious chilling effect on speech" they create. *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

Nelson's credential policy, and her own interpretation of the policy, uses several unconstitutionally vague criteria to justify the denial of press credentials. *See* Exh. G. Nelson's policy limits granting credentials to those who report "nonpartisan news to a broad segment of the public," and does not allow a reporter to engage in any form of "advocacy" on any person or entity's behalf. *Id.* Presently, it is almost impossible to discern what constitutes "partisan news" or what constitutes "advocacy."

It is inexplicable how Jack Hunt was previously permitted press credentials at the same time Belin was denied. This policy is intentionally, and unconstitutionally, vague, which allows Nelson to apply her policy against Belin in a way that deprives her of proper notice of how to comply and chills her speech.

II.   BELIN HAS SUFFERED AND WILL SUFFER IRREPARABLE HARM IF NELSON IS PERMITTED TO ENFORCE THE UNCONSTITUTIONAL CREDENTIALING POLICY AGAINST HER.

Belin has been, and will continue to be, irreparably harmed by Nelson's enforcement of her press credential policy. The 90th Legislative Session began on January 8, 2024 and the House press box was opened that same day. Belin Decl.

17

¶50. Numerous statehouse reporters, besides Belin, were able to cover the gaveling in and opening remarks by the House leaders from both parties on that date. *Id*. On January 9, the governor delivered her Condition of the State speech in the Iowa House chamber. *Id*. ¶51. Again, many statehouse reporters, but not Belin, were able to report on the speech, including obtaining the necessary photos, audio, or video that are not equally obtainable from the public viewing areas of the House chambers. *Id*. The 90th Legislative Session continues until April 2024. *Id*. ¶52. Each day that Belin is denied access is a day her readers are denied her fulsome news coverage. Thus, if this Court does not act immediately, Belin is likely to be deprived of the ability to news gather in a manner equal to that afforded to other statehouse reporters for the entire legislative session. *Id*.

This Court cannot grant access retrospectively. This viewpoint discrimination as to in-person access to such areas designated for the news media is not a de minimis injury. *TGP Communs., Ltd. Liab. Co.*, 2022 U.S. App. LEXIS 33641, at *16. In fact, where a plaintiff is "correct and their First Amendment rights have been violated, this constitutes an irreparable harm." *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140 (8th Cir. 1996); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)) (holding that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). As Belin has explained, *supra*, her First Amendment rights of free speech, free press and news gathering are violated by Nelson's press credential policy.

18

III.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES FAVOR BELIN

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Nelson cannot prove any harm to the Chief Clerk's operations or the public if she is enjoined from enforcing her unconstitutional press credentialing policy pending the outcome of this litigation. The only result from Belin's motion being granted is that Belin will be allowed to access the House press box and news gather in a manner equal to what other media is already afforded. Nelson cannot demonstrate that allowing Belin to do what she already permits other statehouse reporters to do will cause the Chief Clerk's office, or even the Iowa House, harm of any kind. Rather, the public is harmed when Belin is denied equal access to the state house.

Nor will the public be harmed by allowing Belin to news gather. It is "[n]ot only newsmen and the publications for which they write, but also the public at large [that] have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977). Moreover, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), overruled on other grounds by *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

19

IV.    THIS COURT SHOULD FOREGO THE BOND REQUIREMENT

The Eight Circuit "allow[s] the district court much discretion in setting bond [required under Fed. R. Civ. P. 65(c)]." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). In fact, the court has the discretion to require no security at all. *See, e.g., Iowa Prot. & Advocacy Servs. v. Gerard Treatment Programs, L.L.C.,* 152 F. Supp. 2d 1150, 1176 (N.D. Iowa 2001). Indeed, "requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay." *Doctor John's, Inc. v. City of Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004).

A bond requirement would have negatively impact on Belin's rights by requiring her to pay a fee for to engage in free speech and free press. It would also negatively impact the rights of the public to be free from government enforcement of unconstitutional policies. And an injunction requiring Nelson to respect the First Amendment would not harm her. Thus, no bond should be required here.

CONCLUSION

This Court should grant Belin's motion for a temporary restraining order. Following notice to Defendant, and the opportunity for Defendant to be heard, this Court should also grant Belin's motion for preliminary injunction immediately ordering Defendant to issue Press Credentials to the Plaintiff on equal terms with every other member of the press corps.

Respectfully submitted.

Charles Miller*
Ohio Bar No. 0073844
Courtney Corbello*
Trial Counsel
Texas Bar No. 24097533
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, D.C. 20036
Tel: (202) 985-1644
Fax: (202) 301-3399
cmiller@ifs.org
ccorbello@ifs.org

*Counsel for Laura Belin*
*\*pro hac vice admission being sought*

Dated: January 19, 2024

  */s/ Jack Bjornstad*
Jack Bjornstad
Iowa Bar No. 16147
JACK BJORNSTAD LAW OFFICE
1700 Hill Avenue
Spirit Lake, Iowa 51360
Tel: 712-332-5225
jack@bjornstad.law

21